I'm pleased to court your honor, I'm Victor Morsello and I represent Kenneth Guilbeau. This case is, involves a very complicated and controversial decision, involves very controversial and complicated issues of Louisiana mineral law and property law. Kenneth Guilbeau today, and when he filed his suit, owns the bundle of rights that were owned at the time by the landowner, by his predecessor in title, that were owned at that time when the mineral operations occurred on the property, which ended in 1973. The issue really here is whether or not the Eagle Pipe decision controls the results here. And at the outset, it's very clear, in Eagle Pipe, it said, the Supreme Court of Louisiana said, we express no opinion as to the applicability of our holding to fact situations involving mineral leases and obligations arising out of the Mineral Code. So, therefore, it is incumbent upon this court to address the issue of what does it mean when you have a real right in Louisiana created by a mineral lease? Does the ownership of that real right involve obligations that extend even beyond the time when the lease is ended? Mineral leases in Louisiana and mineral servitudes in Louisiana are classified as real rights. And the significance of the classification of a right as a real right means it has implications mainly for the relationship between the grantee of the right, and in this case, the mineral rights created by a contract, a mineral lease, and third parties. I'm not as familiar with Louisiana law as I am in Texas. In Texas, we were talking about severance of the mineral estate from the surface. Was there a severance, and were they ever reunited? Clearly, there was a severance, but were they reunited before your client? The rough equivalent of severance in Texas to Louisiana is a mineral servitude. And I'll get into the history of the law a little bit on that. Well, just as a factual matter, it was clear that there was a severance of the ownership between the minerals and the surface at the point your client owned it. But what about when, in 1973, when Hess ceased operations and the lease expired, was there a severance between the surface and the mineral interest at that time? There was a severance after, as I understand the title. When? There was a severance sometime after, and I don't know the date, after the mineral lease was granted. And the difference, the severance, in Louisiana when you say you sever the minerals, someone owns the minerals, and then whoever owns the minerals has a right to grant a mineral lease. However, the landowner himself can grant a mineral lease without a severance, and that's what happened here. That's what I'm getting at. Let me try to be as clear as I can. Okay. When was there a unity of interest as between the surface and the minerals before, after Enron Hess' lease expired and before your client purchased the property? There was a unity of interest in the minerals and the surface when the mineral leases were granted, and sometime after that the minerals were sold. And I don't know whether they were sold, but it's irrelevant to the discussion here because what we're talking about here is the real rights created by the original mineral lease. And Gilbo is a successor in interest to the owner of the surface, and the sole issue before the court here is does he have any rights to assert under that preexisting mineral lease because he is a successor in interest to the surface owner. Louisiana. I'm just curious. No one has raised prescription, or is there a reason for that? Well, the reason is it's coming next. Okay. One of the reasons, you've asked us to certify the Mississippi Supreme Court, I'm sorry, the Louisiana Supreme Court, and we normally don't like to do that unless it is truly the dispositive issue and everything else in the case that could possibly be dispositive, and it seems to me like there's at least an issue about prescription or limitation. I can tell you, Your Honor, that I just tried a case. There were three cases cumulated together when this suit was filed, the Richard Grosser case, the Gilbo case, and the Turo case. The judge decided to separate the cases. The Richard Grosser case is now pending on a motion for summary judgment on prescription. The Louisiana Third Circuit has just come out with a case where summary judgment was denied. It's called the Trahan case. I don't have the site because I didn't know I was going to talk about prescription, but the bottom line is that the case decided by Louisiana Third Circuit, the operations that were at issue ended 50 years ago. So you do have these long-tail liabilities in Louisiana where an operator might – you might have a lease that lasts 110 years. So you do have these situations, and the prescription issue is a very, very fact-intensive issue, and I don't – if we can go back and try the prescription, we can do that, but the defendants chose to raise this issue first, and there really is no other way to address it other than to deal with it here. Basically, Your Honor, the Eagle Pipe decision did not decide the issue about what is the significance of the mineral lease being a real right. When you have a mineral lease, it creates contractual rights between the parties, and then it creates other rights between third parties. So the issue is whether Gilbo, because of his ownership of the bundle of rights that were previously owned by the surface owner, whether or not he can assert those rights now. And he can assert them even under Louisiana law, regardless of prescription, if no one in the chain of title had knowledge. It's acknowledged that the prescriptive rule in Louisiana on property – on immovable property is based solely on the discovery rule. Now, it's important to keep in mind that what we're dealing with here is a jurisprudential rule created in 1851 in an ice house case involving an ice house on the French border, Clark v. Warner, where they said the subsequent purchaser rule was a jurisprudential rule that says that personal rights don't transfer unless there's a specific assignment when the property is transferred down the chain of title. However, we agree that it's applied to contract rights and tort rights. Certainly, we don't have those rights. What is the nature of the contamination claim? The nature of the contamination claim mainly is contamination caused by pits, unlined earthen pits, and saltwater, produced water placed in those unlined earthen pits. Pits and saltwater? Yeah. Produced water – Louisiana was the last state in the Union to ban the use of unlined earthen pits. They weren't banned until 1989. Kansas, for example, banned them around 1939. We were way behind, so we've got – our geology is different, so we have a lot more. We have many more problems. And that's contaminated the land, how? Contaminated the land because what happens is the produced water seeps out of the bottom of the pit, and you get – there's heavy metals, there's salt contamination, and so forth. That's a complicated discussion. I just wanted to know what we're talking about here. Okay, so the bottom line is this. I'm going to try to get through it, and I've noticed my time is going by. The bottom line is that the mineral servitude – excuse me – the mineral lease in Louisiana is a servitude. It all goes back to the original case, Frost-Johnson v. Salvin-Zayers, which is in the briefing. And this – the mineral servitude – because it's a mineral servitude, it has to be treated differently. A mineral – excuse me – because it's a mineral lease, it has to be treated differently than if it was a – what we call a pre-deal lease, which does not grant real rights. A mineral lease grants a real right, and a real right is a right you can assert against the world. So Frost-Johnson was the first case that said, look, all mineral rights are real rights, and there's a significance to that. And that significance has been basically overlooked, and it has caused a lot of conflict in the jurisprudence. And so – So perhaps let me ask you about the conflict. In cases, you won't know it more than I, like Mundry v. Ed Markel, where they certainly accept that mineral rights are real rights, but then separate this right of the less sore to a couple of damages like this is deemed personal. You say there's a conflict among the state circuits. It seems to be a conflict of laws that have been resolved. What is your best case to focus us on that is still standing after a later case in the same circuit within Louisiana, that really does say that you're right as opposed to Hess is correct in this? Aren't all the circuits now in line to say that what the right you were trying to sue on is actually a personal right? Your Honor, the conflict arises if you look at the Walton case. It's Walton 2. Walton decided in 2015, and Walton 2, Judge Carroll, who knows mineral law probably better than most judges in Louisiana. He wrote very frequently in the Mineral Law Institute journals. He treated the mineral lease in that case, in the Walton case, which I was involved in. That's my case. He treated that lease as creating a servitude, a limited personal servitude, and he stated that the owner of the land, the Waltons, owned the servient estate. The general principle of Louisiana law is that the owner of the dominant estate cannot use his estate in a manner that abuses or damages the servient estate. This servient estate is a bundle of rights which every landowner retains after the mineral lease is granted. In the present case, Gilbo is the successor in interest to the original owner of that bundle of rights and can assert those rights. Now, if you look at the case law, there's no real thread in the circuit courts. First of all, the Supreme Court, by its own statement, says we're not deciding the issue. You have Duck, the Duck case, in the Third Circuit, which says, treats the mineral lease as a limited personal servitude, but then goes on to talk about this Minville case, which I also was involved in way back when. Minville was the first federal case that was decided in Louisiana involving mineral leases and a legacy case involving damages to property involving the mineral lease. In the Minville case, the argument was made, the same argument made here, that the mineral lease is a limited personal servitude. Well, if you read the case and read my briefing, what happened is the U.S. magistrate in that case mixed up the servient estate and the dominant estate. In a mineral lease, the owner of the service is the owner of the servient estate, the owner of the lease is the dominant estate. Basically, what she says, when the lease is transferred, the rights don't go. You have to have an assignment. If the usufruct is transferred, you have to have an assignment. That's true. If you transfer a usufruct, you have to have an assignment, but the usufructuary is analogous to the owner of the lease. The reason one needs to concentrate very carefully on this analogy is because, statutorily, our mineral code incorporates the provisions of the civil code. We have clear law that says a mineral lease is a limited personal servitude and is to be treated as such. We have the mineral code saying you have to look at the articles of the civil code. What we have is, if you look at it and you look at the analogy, if you're the daily owner of the usufruct, you always get to claim damages. I think you make an excellent argument, but how can we hold this with all of the intermediate courts that have held differently? Well, what I'm saying is that the intermediate courts have not held differently. We don't have the right to overrule all these Louisiana courts do. You don't, Your Honor, but in the Walton case, the Walton case directly conflicts. In the Walton case, the personal claims were dismissed, and the court held that based upon the fact that Walton owned the Serbian estate, he could still sue for damages that predated the purchase, and he sued basically what's called in Louisiana, it's called a legal claim. This is how it gets— Your time is up, and I don't want to take any more, but what is a legacy case in Louisiana? Legacy cases is a case involving lawsuits for old oilfield contamination. Well, this is an old one. This is an old one, and many of them are old ones, and they're legacy cases. You want any rebuttal? Yes. You better sit down. Thank you so much. Good morning. May it please the Court. I'm Jonathan Hunter with Liskell and Lewis, and I represent Hess. The parties are in agreement on the facts of this case. There are no factual issues, but neither is this case complicated or controversial, as Mr. Marcello suggests. His description of Louisiana law contains too many years for me to talk about all of them this morning, but let me just talk about a couple of things and answer Judge Owen's question. So first, a mineral lease is its own kind of juridical act, its own kind of juridical animal under Louisiana law. The Louisiana Mineral Code has a little section on mineral leases. It's got a separate section on mineral servitude, so a mineral lease is not the same thing as a mineral servitude. A mineral lease is a combination of a grant of a real right and a contract, and everything other than the real right that the lessee owns is a matter of contract. In terms of the unification of ownership, the leases here, there were a dozen plus leases, maybe 15 leases, granted way back in the 30s and 40s. They expired in 1973 by operation of law, just as a lease in Texas would expire when production ceases or drilling ceases. Those leases expired in Louisiana, and they're dead and gone. They never existed again. They don't exist today. They expired by virtue of what we call a resolutory condition in Louisiana, which was once production ceased, the leases expired. So, Mr. Gilboa, the record does not reflect any current severance of minerals. Mr. Gilboa asserts rights as the 100% owner of all the rights of the land. He owns the minerals, too? Presumably, yes, Judge. I mean, there's no evidence in the record that somebody else owns the minerals, so based on the deed into Mr. Gilboa, he would own the minerals as well. Okay, I didn't understand. Right, and there are no leases. The land is unleased, and certainly Mr. Gilboa has no connection with the leases that expired in 1973. So, the facts aren't in dispute. What's before the court is an issue of Louisiana law that has been repeatedly in front of the Louisiana appellate courts, and it's this, whether a party that acquires property has a right of action, and that's the Louisiana term, a right of action, the more common term is standing, whether a party that acquires property has standing to sue a former mineral lessee of an expired lease for property damage allegedly caused by the lessee before the new owner acquired the property. So, in this case, the mineral operations ended in the early 70s. Mr. Gilboa acquired the land in 2007. On this point, Louisiana law couldn't be more clear. Under those circumstances, the landowner, here Mr. Gilboa, has no standing to sue a former mineral lessee of an expired lease, which in this case is Hess, and the district court got it exactly right when it granted summary judgment in favor of Hess, saying, quote, Louisiana jurisprudence overwhelmingly classifies a right of action on damages to land as a personal right rather than a real right that runs with the land. The court got it right, and Hess respectfully asked the panel to affirm summary judgment. Louisiana law is so well settled on this issue that in 2013, an earlier panel of this court in Broussard v. Dow Chemical not only applied the subsequent dirt purchaser doctrine to deny the claim of the landowner, but the court decided neither to publish its opinion nor to grant certification to the Louisiana Supreme Court. If you read the opinion, you don't see anything about certification. But in the record in the case, if you look at the briefs, it's very clear that the appellant requested certification and the panel in Broussard v. Dow chose not to do so. And given the applicable Fifth Circuit rules on both publication and certification, it seems clear that the panel in Broussard chose not to publish because the law is well settled, that's the local rule on publication, and chose not to certify because it determined that there were controlling Louisiana precedents. That's the standard on certification. So that was in 2013, and it would be an understatement to say that Louisiana law remains settled on this issue. In fact, as the Louisiana Supreme Court demonstrated in Eagle Pipe, Mr. Marcello acknowledges the subsequent purchaser doctrine has been part of our law since 1851. After Broussard, after 2013, we've had more decisions applying the subsequent purchaser doctrine in Louisiana, including decisions that are exactly like this one involving expired mineral leases. And Broussard v. Dow, by the way, involved the exact same effects, effectively, a claim by a landowner against a lessee of a former lease that had expired. Some examples of post-Broussard cases applying the doctrine in the context of expired mineral leases are the First Circuit's decision in Global Marketing, that's 153 Southern 3rd, 1209, and the Third Circuit's, the Louisiana Third Circuit's decision in Bundrick v. Anadarko, 159 Southern 3rd, 1137. Those two decisions could not be more on point with the facts and legal issues in this case. And critically, so we've had this body of law and the subsequent purchaser doctrine build up over the years, and it is increasingly applied to cases involving mineral rights. But in building that body of law, Louisiana courts have repeatedly considered and rejected the very same property law arguments that Mr. Gilbo is asserting today. Mr. Marcello noted that he was counsel in some of these other cases, and these very same arguments were asserted in those cases and rejected by the courts. In both Global Marketing and Bundrick that I just mentioned, the landowners asserted that the right to sue for damages was a real right that automatically transferred with the land based on the same combination, they asserted, of mineral code and civil code articles that Mr. Marcello relies on today. In both Global Marketing and Bundrick, the landowner relied on mineral code article 11, mineral code article 134, and civil code article 667. And in those cases, the courts considered those arguments and rejected them. The same arguments were also rejected prior to the Louisiana Supreme Court's decision in Eagle Pipe in cases involving mineral leases, expired mineral leases. And you can see that in Lejeune v. Goodrich, which is a 2007 decision by the Louisiana Third Circuit, and in the Western District of Louisiana's Minville case, the IMC Global, from 2004. I recognize that the Minville case is a federal court case rather than a state court case, but I point it out for two reasons. One is it contains a particularly clear analysis and explanation of this area of Louisiana law, and second, Louisiana appellate courts have actually cited the Minville case when these issues have come up, so the Louisiana state courts have relied on it as an accurate statement of the law. As one reads all of these subsequent purchaser doctrine cases involving the oil and gas industry, the only thing that really challenges from one case to another are the parties. In every case, the legal theories that have been asserted are the same. In every case, the legal arguments about real rights are the same. And in every case, the results are the same. The Louisiana courts have uniformly determined that the right to assert a claim for property damage is not a real right that transfers with ownership, but is instead a personal right that can only be transferred through assignment. Mr. Marcello mentioned the Walton case this morning, and he relies on it heavily in his briefs. The Walton case by the Louisiana Second Circuit in 2015 gives Mr. Gilbo no support and no cover in this case. First, in Walton, there was one issue on appeal in Walton, which was whether the trial court had correctly dismissed the landowner's pre-purchase damages claim brought against former and current mineral lessees and servitude owners. The appellate court affirmed that dismissal, and that's entirely consistent with the body of Louisiana law. It's entirely consistent with HESA's legal defenses here. And because the only issue in Walton had to do with those pre-purchase damages, that was the only issue on appeal, the court's statements about unadjudicated claims and about post-purchase damage claims were dicta, as the concurring opinion in Walton made clear. But above all, the important thing when reading Walton is this. The statements by the court about unadjudicated claims and post-purchase damages, those were based entirely on the fact that in Walton, unlike here, in Walton, at the time of the suit, the land was subject to existing mineral leases and mineral servitude. So the land was burdened in that case with these existing mineral rights, meaning that there was a concurrent, ongoing use of the property by both the surface owner and these mineral owners, creating the possibility that the new landowner would, at some point, have claims against those parties. But the fact that there are existing leases and servitudes in Walton makes Walton categorically different from Mr. Gilbo's suit against HESA. Mr. Gilbo, the leases at issue in Mr. Gilbo's case are not, the leases, I'm sorry, the leases at issue in this case expired, as I said, in the early 1970s. There is no active mineral lease between HESA and Mr. Gilbo on that land. What we're talking about are expired leases, and that is categorically different than in Walton. Mr. Gilbo agrees. Let me ask you about Walton. Can you hear me? Yes, Your Honor. In Walton, the purchasers, the current owners at the time, your understanding of what the court was saying, assuming on their own personal rights, that could not sue on the personal rights of former surface owners at all, which would fit within your application to Walton in this case? If I follow you, Judge, that's right. The current owner could have claims against the owners of the mineral rights based on conduct during the ownership by the current owner, but not before. I was focusing on this label of personal rights, and maybe you're not quite accepting that, but that seems to me to be what a lot of these cases are saying, that they are separating the categorization under the median of the law, and what does say with the seller that Gilbo did not receive any personal rights to sue over the damage. That's right, Your Honor. The key to all this entire area of law is to understand that the Louisiana courts have time and again found that the right to bring a claim for damages to property is a personal right. And further, there's a key fundamental point here that Mr. Gilbo misses, and it's this. In Louisiana law, there's a requirement in every case that in order for there to be a claim for property damages, there has to be a temporal alignment between the plaintiff's ownership of the land and the defendant's conduct. And by that I mean in a claim for property damage, and it doesn't matter what the legal theory is behind the claim. It could be tort, it could be contract, it could be something else. It doesn't matter what remedy is sought, whether it's money damages or restoration. Any claim for property damage is personal, and so it can only be brought by the person who owned the land at the time the alleged damage occurred. Without that temporal alignment, without ownership occurring simultaneously with the defendant's conduct, the property owner has no claim against the defendant. You're not saying there couldn't be a legitimate assignment? There could, yes. There are circumstances under which the owner of property at the time the damage occurred could assign its claims to a new owner. That would then be subject to likely different defenses, but that assignment is a possibility under Louisiana law. And here, Mr. Gilbo admits in this case in the record that no such assignment occurred. I just want to make sure you're not just saying categorically no matter what. That's right. Speaking of categories, let me make sure we are looking at damage to property that is known to the buyer, not in effects caused by the occurrence of informer ownership. Is that an important distinction here, and that's the only part of Louisiana law we're looking at, where the damage, the effects of informer ownership are known? Actually, Your Honor, that's not an issue here, and I'm glad you raised it. So one of the most significant parts of the Louisiana Supreme Court's Eagle Pipe decision was to establish that the subsequent purchaser doctrine applies both in the case of apparent known damage and to unapparent unknown damage, that this particular doctrine applies regardless of whether the damage is known or unknown. Now, just because Mr. Gilbo doesn't have a claim against Hess doesn't mean he has no remedies. He could sue the party that sold him the land in warranty, and he can also go to the Louisiana Department of Natural Resources and ask them to initiate a regulatory proceeding if the land is in fact contaminated, the Department of Natural Resources may do that. And the Supreme Court in the Marin case, 48 Southern 3rd at 256 footnote 18, made note of the possibility of that sort of regulatory claim. Here, Mr. Gilbo has admitted that Hess has not been on his land since the 1970s. In his reply brief, Mr. Gilbo said that he's not seeking pre-2007 damages, pre-purchase damages. In addition, in the district court, Mr. Gilbo conceded that he is not asserting any sort of post-acquisition, continuing trespass, or continuing tort. When you put all of these things together, Hess hasn't been on the land. He's not seeking damages prior to his acquisition in 2007. He's not asserting continuing trespass or continuing tort. He's effectively conceded that Hess has no liability. There is nothing else. We've had 200 years of civil law in Louisiana. We've had more than 100 years of oil and gas case law, and there's not a single case or statute that supports his claim. One other point related to Mr. Gilbo's reliance on Walton. In his opening brief at pages 27 and 29, Mr. Gilbo said that the post-purchase, non-adjudicated claims in Walton were claims based on Louisiana revised statutes, Title 30, Section 29. But in an earlier pleading in the district court, Mr. Gilbo said that that very same statute, Title 30, Section 29, does not apply in this case, and that's in the record at pages 1009 through 1013, where Mr. Gilbo admits that Louisiana Statute 30, colon 29, does not apply. Given that he says that that is what the non-adjudicated claims in Walton were, and given the admission that that doesn't apply here, that too demonstrates that he has no claim. I'd like to walk through briefly some of the Louisiana decisions. In terms of decisions by the Supreme Court and the appellate courts, a couple of points. One, the Fifth Circuit has in many cases looked to the lower appellate courts in Louisiana to guide them in a diversity case. Here, I think if you look at the sequence of some of the Louisiana Supreme Court actions, it demonstrates that the Supreme Court knows exactly what's going on and has determined that the subsequent purchaser doctrine applies to a case like this. For example, consider the global marketing case where when the case first was in the trial court in the First Circuit, those courts said that the subsequent purchaser doctrine did not apply. Then Eagle Pipe comes out. A writ application in global marketing goes up to the Louisiana Supreme Court. The court grants the writ and remands the case with directions to apply the Eagle Pipe analysis. The trial court and the First Circuit both agree that based on Eagle Pipe, the subsequent purchaser doctrine did apply to bar the claim. The landowner sought then a writ from the Supreme Court, and the Supreme Court denied it. So when the lower appellate court had refused to apply the subsequent purchase doctrine, the court granted the writ with instructions to reconsider. When the lower appellate court applied the doctrine and said the claim was barred, the Supreme Court denied the writ. On the same day that the Supreme Court remanded the Walton case, and that was about six months after Eagle Pipe, another case was before the court, and in that case, in Wagoner, it was a second circuit case where the doctrine, the subsequent purchase doctrine, had been applied. The court denied the writ there. Again, in a case where the doctrine had been applied, the court refused to take hold of the case. The Louisiana Supreme Court in the six years since Eagle Pipe has had numerous opportunities to accept writs in cases involving mineral leases. The court has done so only in those situations where it looks like something needs to be fixed, so in global marketing where the case needed to go back down and have the doctrine applied. There was another case, Pierce v. Atlanta-Bridgefield. This is in your brief, right? Yeah, that's right. Just a couple more points in my remaining seconds here. The conflict between the circuits that Mr. Marcello exists doesn't exist, and we've covered that well in our brief. One point about the legislature. Louisiana courts have been consistent on this point for 150 years. The legislature has revised the civil code repeatedly over that same time period, and not once has it chosen to change the subsequent purchase doctrine that the courts have applied so consistently. So the legislature, in none of its revisions, has seen the need to disturb this doctrine. Unless anyone has any questions, I'm out of time. Thank you. I just would like to read one passage out of Walton which I think settles the issue. Both the mineral lease and the mineral servitude burden the owner of the land with an identical right of use to explore for and produce minerals. Such a right of use is called a right of use servitude in Louisiana. Such right of use of the owners of the incorporeal immovable is a charge upon the ownership of the land, making the ownership of the land a virtual serving estate. It's a servitude. And if it's a servitude, you apply it. But I thought Walton, too, held that the pre-purchase damages could not be recovered. And therein lies the issue. And that's why the courts in Louisiana have been confused. There is a difference between those personal rights for damages that were dismissed and the rights of the owner of a serving estate to obtain either an injunction or damages. That's a property law claim. It's not a personal claim such as a tort claim or a contract claim. Then why did Walton, too, dismiss the claim for pre-purchase damages? The pre-purchase damages that were dismissed in Walton were the tort claims and the contract claims. The claims of Walton. Why didn't Walton clarify, well, if you just brought it the other way, we'd have something different? I mean, they didn't say that. They said. They say in Walton here. They said they recognize the servitude for post-purchase but not pre-purchase. Yes, but my point is that if part of the damage that is burdening the serving estate occurred prior to the purchase, Walton could still sue for that. Well, but Walton said you couldn't. They said you could sue under that very theory that you're talking about for post-purchase. But the post-purchase damages. The post-purchase damage is not the same as post-purchase damages. We're talking not money damages. We're talking damage. It says in Walton, Pliny was not asserting any right as owner of the serving estate to restore the premises but only as a predecessor personal damage claims for which the plaintiff has had the right of action. It all gets down to something very simple, Your Honor. Look at Clark v. Warner, the first case on the subsequent purchaser rule. And that case and an unbroken line of cases. Why hasn't the Louisiana Supreme Court acted in any of these cases? That's, if you've got about three hours, maybe I can answer that question. Well, I mean, we're just sitting here looking objectively and the issue's been teed up repeatedly. It's been teed up several times. And they haven't taken it. They haven't taken it despite my best efforts. I think eventually they will take it. Eventually they're going to have to take it. But you've asked them to take it. I've asked them to take it. And they've said no. Since the Eagle Pipe decision, I think, three times. And they've said no each time. Denied rents, correct. And there have been, I think, in one or two of those cases have been dissents from the denials. So they know the issue's out there. They know the issue's out there. And they haven't taken it over dissents from the colleagues. And that's why I'm here, Your Honor. I'm asking you all to take it. I hear you. And I'll take anything. I just want you to talk. You've heard of the word comity? Huh? Comity. C-O-M-I-T-Y. Yes, comity. I got it. I understand that very well. I may have misspelled that. But a good way to get over those problems is to ask the Louisiana Supreme Court, what's the answer to this question? We have a direct conflict, in my mind, in the circuits. And we have, by the Supreme Court's own explicit expression, it has no opinion. It has stated no opinion on this issue. And as I was beginning to say, in the unbroken line of jurisprudence from the day one, 1851, the courts have always held that actions related to the enjoyment of the thing sold pass without an assignment. So if you own the naked ownership, for example, in a usufruct, you buy property subject to a usufruct, say a spouse had a usufruct. You have a right when that usufruct expires to sue that spouse or whoever had the usufruct for damages. You have that right, and it's based upon the fact that you have owned that property, you owned that bundle of sticks that was the naked ownership. And the important thing here is that that claim, that claim can be asserted at any time. Okay, counsel, we have your argument. Thank you for your time. Okay, thanks. Okay. Time out. Thank you, Judge. We do have your argument. We get it. I try to be meticulous. Thank you.